UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICIA TORRES,<br><br>                 Plaintiff,<br><br>  -against-<br><br>ESTÉE LAUDER COMPANIES and RANDSTAD USA,<br>                 Defendants. | No.   23 Civ. 8875<br><br>**COMPLAINT AND JURY DEMAND** |

       Plaintiff Patricia Torres, by and through her attorneys Kaufman Lieb Lebowitz & Frick and Bantle & Levy LLP, alleges as follows:

**PRELIMINARY STATEMENT**

       1.     Patricia Torres is a highly skilled senior analyst who suffered severe pregnancy discrimination by the Estée Lauder Companies ("ELC") and Randstad USA ("Randstad," and collectively with ELC, the "Companies").

       2.     Ms. Torres was recruited by the Estée Lauder Companies in March 2020 through its staffing agency, Randstad USA, and began work in April 2020.

       3.     Despite her stellar performance record and integration into ELC, Ms. Torres was repeatedly told that she could only work as an independent contractor and could not be hired as a full-time employee due to budget restraints.

       4.     In December 2021, after nearly two years working as an independent contractor for the company, Ms. Torres was finally approved for full-time employment to begin in July 2022.

       5.     Shortly after she received budget approval for her position, however, her supervisor told her that her offer had been revoked because she was pregnant.

6. The brazen pregnancy discrimination she experienced added to the stress of Ms. Torres's high-risk pregnancy and took an incalculable toll on her emotional well-being.

7. She now demands the Companies be held accountable for their wrongdoing.

## PARTIES

8. Estée Lauder Companies is a company incorporated under the laws of Delaware, with its principal place of business at 767 5th Avenue, New York, NY 10153. ELC owns dozens of makeup, skin care, fragrance, and hair care brands and employs more than 60,000 employees worldwide.

9. Randstad USA is a company incorporated under the laws of Georgia, with its principal place of business at One Overton Park, 3625 Cumberland Blvd SE, Atlanta, GA 30339. Randstad provides staffing and recruitment services for companies nationwide. Randstad's on-site office at the Estée Lauder Companies is located at 28 W. 23rd St., 8th Floor, New York, NY 10010.

10. At all relevant times, Randstad served as a professional staffing and employment agency for ELC.

11. Complainant Patricia Torres was jointly employed by ELC and Randstad as an Independent Contractor in the finance department at OneSource, which is a division of ELC.

12. ELC was responsible for assigning work to Ms. Torres, supervising her in the performance of that work, and controlling her work schedule.

13. Randstad paid Ms. Torres's salary during her term as an Independent Contractor for ELC.

**JURISDICTION AND VENUE**

14. This action arises under Title VII, 42 U.S.C. § 2000e and the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 *et seq*.

15. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332, as the Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds $75,000. This Court also has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States. The Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

16. The acts complained of occurred in the Southern District of New York, and venue in this Court is proper under 28 U.S.C. § 1391(b).

**JURY DEMAND**

17. Plaintiff demands a trial by jury in this action.

**FACTUAL ALLEGATIONS**

18. After decades of experience working for retail brands as a staff accountant and accounts payable manager, Ms. Torres began working for ELC in April 2020 under the title of independent contractor.

19. Ms. Torres worked remotely from her residence in New Jersey.

20. Randstad recruiter Karole Levine reached out to Ms. Torres in March 2020 to recruit her for a position with ELC based on Ms. Torres's extensive experience in accounts payable, through which she had cultivated skills in vendor management.

21. Given her background as a licensed esthetician, Ms. Torres was thrilled for the opportunity to work with companies under ELC's umbrella, including some of the world's biggest beauty brands.

22. By April 2020, Randstad had hired Ms. Torres for assignment at ELC. On April 3, 2020, Ms. Torres completed the onboarding paperwork with Randstad to begin her work at ELC.

23. Ms. Torres quickly excelled in her role as a senior analyst in the finance department at ELC's OneSource, where she assisted with managing vendor contracts alongside her supervisor, Seth Schwartz, Director of Business Process Outsourcing and Shared Services at ELC.

24. As a senior analyst, Ms. Torres created and managed executive-level documents for leadership, assisted Mr. Schwartz with contract negotiations, and produced budgets and reports for vendors.

25. Mr. Schwartz recognized that she was an indispensable asset to his team and frequently praised her work.

26. In recognition of her excellent performance and high potential for growth within ELC, Mr. Schwartz began working with Ms. Torres almost immediately to try to find a path for her to a full-time salaried position at ELC.

27. He recommended her for open positions within other teams at ELC and attempted to create funding in the ELC budget to pay her salary.

28. In a glowing letter of recommendation supporting Ms. Torres's candidacy for a full-time employee position at ELC, Mr. Schwartz commended Ms. Torres's "organized and thoughtful" management skills as applied to the "large strategic global projects at OneSource."

29. He highlighted Ms. Torres's PowerPoint skills, calling her decks "some of the nicest looking presentations" at the brand, and described her as "exactly the type of

person I would want on my team," adding that he had "been working for 18 months now to keep her onboard." *Id*.

30. In April 2021, Mr. Schwartz shared with Ms. Torres an idea designed to lead to her full-time, salaried employment at ELC within the OneSource team: he would request $100,000 in funding from Procurement—one of OneSource's vendors—to be used to support her salary.

31. Although Ms. Torres eagerly consented to this approach, the plan fell through over the next few months. As Ms. Torres later learned, Mr. Schwartz had been promoted to Executive Director.

32. The funding from procurement and an additional $100,000 budgeted from other sources was used for Mr. Schwartz's replacement and the hire of two additional employees.

33. In August 2021, Mr. Schwartz's replacement, Laszlo Matyas, began supervising Ms. Torres and conducting weekly one-on-one supervision meetings with her.

34. Although Mr. Schwartz had become Executive Director and no longer supervised Ms. Torres directly, he continued to meet with her occasionally and again raised the idea during the fall of 2021 of securing funding through a OneSource vendor that could be used to pay her salary at ELC.

35. Ms. Torres was hopeful that Mr. Schwartz's continued efforts to secure a salaried position for her at ELC would be fruitful, and she was excited by the prospect of working at ELC in a full-time, permanent role.

36. By the winter of 2021-2022, Mr. Schwartz had finalized plans for Ms. Torres's full-time salary beginning in July 2022 (FY 2023).

37. Mr. Schwartz met with Ms. Torres to explain the plan on December 15, 2021, before he took parental leave for five months.

38. Mr. Schwartz advised Ms. Torres to incorporate funding for a senior analyst from Finance into the Genpact budgets for her position.

39. He told Ms. Torres that, after billing the funds to Genpact, she would be onboarded as an employee beginning July 2022. Mr. Matyas supported the idea, and Ms. Torres was thrilled.

40. Two months later, on February 7, 2022, Ms. Torres received a confirmation email from Kaitlyn Capria Wolff in the finance department that Ms. Torres could proceed with a OneSource support charge of $230,000 to cover the salaries for herself and Mr. Matyas, among other costs, for FY 2023.

41. From this correspondence and from discussions with Mr. Schwartz, Ms. Torres understood that she would soon begin full-time employment with ELC, which would maintain control over her supervision and training, and would begin to issue her paychecks and benefits.

42. Upon receiving the confirmation, Ms. Torres breathed a sigh of relief knowing that her salaried position with ELC was secured and would provide security and healthcare for her family, including her baby who would be born in August 2022.

43. With the budget and approval for her position at ELC in hand, Ms. Torres turned down interviews for employment at other companies.

44. However, her relief soon turned to shock and disappointment upon learning that her offer was rescinded based on her pregnancy.

45. On March 4, 2022, Ms. Torres informed Mr. Matyas that she was pregnant. Ms. Torres had a high-risk pregnancy and had just returned from the emergency room, where she had sought care for pregnancy-related complications.

46. Less than one month later, on April 11, 2022, Mr. Matyas met with Ms. Torres to tell her she was no longer being offered the position.

47. When Ms. Torres asked Mr. Matyas why her offer had been revoked, he informed her that he had discussed the position with Mr. Schwartz and Omar Rios, who was temporarily filling in for Mr. Schwartz during the latter's parental leave.

48. Together, the three men had concluded there was "no point" in onboarding Ms. Torres to a full-time position given that she was pregnant and would be taking parental leave soon.

49. Mr. Matyas explained that she would continue to be paid while on parental leave and made a perfunctory offer to help her find a position with ELC upon her return from leave.

50. Ms. Torres was devastated. She had been so excited to build her career at ELC and she could not believe that her employment was being rescinded due to her pregnancy.

51. She pressed Mr. Matyas on the reasons why ELC had rescinded her position, which Mr. Schwartz had worked for more than a year to secure, and Mr. Matyas callously responded by asking her what the difference was to her, given that the work would be the same.

52. It would not have been the same. Among other things, Ms. Torres would have been entitled to greater parental leave and other benefits, she would have the job

security associated with a full-time position, and she would have had more and better opportunities for work and advancement within ELC.

53. Ms. Torres asked Mr. Matyas what would happen to the Genpact budget allocated for her salary, and he informed her that it would be used to hire a new employee taking over her work while she was on parental leave.

54. Mr. Matyas also advised Ms. Torres to speak with the ELC human resources department. He assured her that he would personally ensure the department was aware of the situation, and would give them information they needed to "make things right" and "find a solution for everyone involved."

55. After several unsuccessful attempts to reach a representative from the human resources department, Ms. Torres spoke with Francymel Barrios, HR Business Partner for Global OneSource & Latin America Distributor Markets, on May 6, 2022.

56. During their discussion, it became clear to Ms. Torres that Mr. Matyas had not disclosed the details of Mr. Torres's situation to the human resources department, as Ms. Barrios had no knowledge of Ms. Torres's situation or what Human Resources could do to help. In the end, Ms. Barrios offered no solutions.

57. On June 6, 2022, Ms. Torres informed Randstad, through a conversation with Ms. Levine, that ELC had rescinded her offer of employment based on her pregnancy.

58. Randstad did not take any meaningful action to address or rectify ELC's brazen discriminatory treatment of Ms. Torres.

59. Mr. Matyas assured Ms. Torres that Randstad would continue to pay for her parental leave benefits and provided her with a new contract for employment upon her return to work.

60. ELC approved Ms. Torres' timesheets, and, on information and belief, had authority to ensure that Randstad would pay Ms. Torres her parental leave benefits and renew her contract upon her return.

61. On June 7, 2023, the undersigned counsel for Ms. Torres sent ELC a letter outlining her claims against the Companies.

62. On information and belief, ELC communicated the substance of Ms. Torres's letter to representatives at Randstad.

63. Ms. Torres' last day of work was August 25, 2023. She gave birth two days later, on August 27, 2023.

64. When Ms. Torres logged onto her Randstad timesheet portal, she noticed that Randstad had terminated her contract, effective August 31, 2023.

65. Ms. Torres was never directly told by anyone at Randstad or ELC that her contract had been terminated.

66. Instead, Ms. Torres received an email from Randstad requesting that she coordinate a pickup of her equipment with ELC personnel.

67. She never received parental leave benefits from Randstad, and her contract was never renewed.

68. Ms. Torres has suffered significant economic and emotional damages stemming from the discriminatory revocation of her offer of employment and the termination of her contract at ELC.

69. Because she was not hired for a staff position, she was forced to pay higher health insurance premiums, denied 401(k) profit-sharing, and denied bonuses and vacation benefits—even though she worked the same hours as her full-time colleagues.

70. Because her contract was terminated and ELC did not hire her as promised, Ms. Torres was denied parental leave benefits from both Companies and left without employment following the birth of her child in late August 2023.

71. She also turned down interviews for other jobs based on the promise of employment at ELC.

72. Ms. Torres felt deceived, shocked, and dismayed when her offer of employment was withdrawn and her contract was terminated despite her tireless work and outstanding performance at the Companies for two years.

73. Alongside the stress of a high-risk pregnancy, Ms. Torres was forced to grapple with the emotional distress of being cast aside and betrayed by Companies who brazenly discriminated against her because of her pregnancy.

74. Ms. Torres is entitled to compensation for the Companies' discriminatory treatment of her, including both for the emotional distress she has suffered and for the economic benefits denied to her.

75. On December 14, 2022, Ms. Torres submitted a charge with the EEOC against Defendants alleging that she was denied employment on the basis of her pregnancy. On August 2, 2023, the EEOC issued Plaintiff a Notice of Right to Sue.

**FIRST CAUSE OF ACTION**
**Title VII – Gender Discrimination**
**Against Defendant ELC**

76. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

77. Defendant ELC discriminated against Plaintiff on account of her pregnancy in violation of Title VII, 42 U.S.C. § 2000e *et seq.* by refusing to hire Plaintiff because of her pregnancy.

78. As a result of ELC's discrimination, Plaintiff suffered damages, including deprivation of income and benefits, loss of employment opportunities, emotional pain and suffered, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**SECOND CAUSE OF ACTION**
**Title VII – Retaliation**
**Against All Defendants**

79. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

80. Defendants ELC and Randstad retaliated against Plaintiff in violation of Title VII, 42 U.S.C. § 2000e *et seq.* by terminating her contract based on her report of gender discrimination.

81. As a result of Defendants' retaliation, Plaintiff suffered damages, including deprivation of income and benefits, loss of employment opportunities, emotional pain and suffered, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**THIRD CAUSE OF ACTION**
**NJ. Law Against Discrimination – Gender Discrimination**
**Against All Defendants**

82. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

83. Defendants ELC and Randstad discriminated against Plaintiff on account of her pregnancy in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*, by refusing to hire Plaintiff because of her pregnancy.

84. As a result of Defendants' discrimination, Plaintiff suffered damages, including deprivation of income and benefits, loss of employment opportunities, emotional pain and suffered, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1. Compensatory damages in the form of:

    a. Lost wages with interest based on Plaintiff's appropriate compensation had she not been subject to unlawful discrimination in an amount to be proved at trial;

    b. Compensation for benefits, experience, training opportunities that Plaintiff would have received had she not been subject to unlawful discrimination in an amount to be proved at trial;

    c. Damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial;

2. Punitive damages in an amount to be determined at trial; and

3. Other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated: October 10, 2023
New York, New York

                                        KAUFMAN LIEB LEBOWITZ & FRICK LLP

                                        _____
Alanna Kaufman
Alyssa Isidoridy
18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332


                                        BANTLE & LEVY LLP

                                        _____/s/_____
Sherie Buell
99 Park Avenue, Suite 1510
New York, New York 10016
(212) 228-9666